Page number 26-51230, National Trust for Historic Preservation in the United States v. National Park Service at all, Attendance, Mr. Roth for the attendance and Mr. Hewitt for the accolades. Good morning. May it please the Court, Yakov Roth on behalf of defendants. The District Court's injunction is legally indefensible and equitably inconceivable. We've set forth three separate grounds for reversal, and I'd like to walk through each of those in turn, starting with standing. The Trust premises its standing on asserted farms to one of its members, Ms. Hoagland. I think the key paragraphs in her declaration are paragraphs 12 and 13, which appear on J.A. 7677. Paragraph 12 says that Ms. Hoagland expects to have reason to be in the White House area about once a month, and then paragraph 13 objects to and criticizes the architectural statement that she thinks the construction of the ballroom will send. There's no explanation there as to how the project will harm her particularized interests. There's no explanation as to how it will impede her professional research. There's no suggestion that her plans will change at all as a result of the project. It is simply that she thinks she will not like how it looks after the building is built. That is a classic generalized grievance. I think this Court's decision in Environmental Defense Fund is controlling on that point. That's the case about the FERC pipeline that involves constructing a metering station about half a mile from the plaintiff's home. She said it would be an eyesore. It would ruin the character of her neighborhood. She would have to drive by it several times a week. This Court said that's not good enough for Article III injury. I think the Supreme Court's decision in Alliance for Hippocratic Medicine is to the same effect. There we have the doctors who said they derived professional and aesthetic enjoyment from delivering human life and that seeing abortions occur was going to detract from that professional and aesthetic enjoyment. Supreme Court in a footnote rejected that theory of standing citing Valley Forge for the proposition that distress or disagreement with someone's activities does not count as Article III injury. Now, the trust relies on the aesthetic injury line of cases. I think those cases stand for the proposition that if the government is doing something that is going to prevent you from doing or seeing something that you want to do or see, there might be cognizable injury. If you want to swim in the lake— Can I interrupt you there? Yes. Just imagine the declaration simply said, I travel to Lafayette Square to view the White House once a month. I enjoy the building's modest design. If this new massive ballroom is completed, it will harm my aesthetic interests and enjoyment of the building. Is that enough understanding? I don't think that's enough, Your Honor, because I still think the White House—she can still come and look at the White House. The White House isn't changing. What she's really saying is there's this other thing that you're putting up that's going to sort of make me enjoy it less. I don't think that's distinguishable from EDF, where the plaintiff said, this is going to ruin the character of my neighborhood. And I don't think it's distinguishable from Alliance, where the doctor said, you know, having to witness these abortions in my hospital, my workplace, where I come every day to thrive for professional satisfaction, that's not enough to count as Article III injury either. So we do have a lot of cases, environmental cases usually, where someone wants to visit a site and, say, view a battlefield—this is Sierra Club v. Jewell from 2014. And the government was proposing to approve some coal mining on part of the battlefield. It wasn't going to totally disrupt the view, wasn't going to totally disrupt the battlefield, but the articulated interest was in viewing the battlefield as it is. And we held that there was standing. Can you think of a distinction between that case and this one? So a couple of things, Your Honor. First of all, I don't think that this declaration here actually says all the things that— I appreciate those arguments. So there's some factual distinction. I think the second point is, I think there's a self-inflicted aspect here that may not have been present there. So it's clear from the record that there will still be places to stand and see the White House where you cannot see the ballroom at all. Now, the district court said there will be places where you could stand where you might have a view, but he pointed to a series of renderings that equally made clear that at least in the classic locations where people come to view the White House from the south, you cannot—you will not be able to see the East Wing. It is obstructed by the Jefferson Mounds. If you come to the front from the North View, the classic view, the trees are designed to shield the view. And that testimony is at—testimony is at JA 225. The district court also pointed to some renderings that are—that have pictures. But the point is, you want to come and see the White House and not see the ballroom? You can still do that. So there is an aspect of this that, you know, either it's going to be an incidental viewing, right? Like, I happen to be walking by. She says, you know, I'm going to a doctor's appointment. I'm going to an exhibition in the area. Or it's going to be self-inflicted, you know, intentionally putting yourself in the position where you see this thing that you don't like. So I think those are—those are distinctions. Do people have to walk a different way, change their routes, look at the White House from only a certain vantage point than if they wish to look at it from one they routinely do or look at it from multiple vantage points, as people often want to do with special sites? That's not an injury? So, Your Honor, two things to get on that. Number one, she doesn't say that. So we're— I'm answering my question. Yeah, yeah. No, I—and I'll answer the leap of what I just want to say. That's not what the declaration says here. I don't think that would be enough for standing in this type of context where you are still able to see the thing you want to see. And again, I'm assuming that the environmental cases— She wants to see the White House complex in a way that perpetuates the architectural design of modesty and simplicity. And when you say, well, hold your hand like this while you look at it, and you'll be good. That's not an injury? So that's not quite what I was saying, that you have—that she's going to have to intentionally avoid it. That's what you're saying. I think she would have— It's a way to look at it without seeing the ballroom. I think it's actually more that she would have to— Be self-inflicted to put your hand down. I think she would have to intentionally put herself in the very narrow locations where you can actually view it. The whole point is it's designed to be— There are facts findings by the district court that there's some odd, obscure, narrow place that's the only place you're going to be able to see a 90,000-square-foot ballroom. Is there a fact finding to that effect? He has a footnote on this where he cites a link to pictures that are in the National Capital Planning Commission submission that show how it looks from many, many different vantage points. East Wing is gone. Oh, excuse me. East Wing from the North Viewpoint. We were in the South Viewpoint before, and now it won't be there. And what will be there, even if she doesn't see the ballroom, is a completely different colonnade, a much larger asymmetrical colonnade, the whole thing, that whole side of the White House. You have all these arguments about how important it is to protect the stability of the White House itself. All right. So the whole side is gone, you know, sort of a third. If you think of people looking at it in sort of three parts, a third is gone. Right. And so all you have, you said, is he cites to these pictures. Is there a fact finding? This seems like a really important fact. If someone had to sort of, you know, get a telescope or crawl through bushes or something like to try to see something, I take your point. But if right up front looking at it, gone, and with this design replaced by something bigger, different, leading to something even much bigger, that seems important. You need to know. And that's not the record that was made. So the only record, the evidence in the record is JA 225, which is the declaration that explains how the views will not be impacted. That was not contradicted by any declaration from the other side. In fact, when we initially said, we initially took a position she won't be able to see it at all. And the trust response to that was that's irrelevant. Not that it's not true. They said, no, it's irrelevant that we can't see it in an aesthetic injury case, which I think speaks to the fact that if you look at her declaration, it's much more about harm to the park, harm to the cultural resources, harm to the community. It's very abstract and it's not tied to her. But regardless, the district court did make a finding that he said, no, it's not true that she won't be able to see it at all. It will be visible, and he cited these pictures, from certain locations. My point is just, she doesn't say she specifically wants to see it from those locations. And she doesn't actually say that she wants to see it at all. We're reading that into the declaration. I can move on to sort of the legal point. I don't think legally it would change the outcome if she had said, yes, I want to see it from that vantage point. I still don't think that is really distinguishable from an Article III standpoint from EDF and Alliance where the injury was, or the asserted injury was, there's going to be something, I'm going to see it, I'm going to not like it, it's going to hurt my enjoyment and satisfaction. And under the Valley Forge principle- She walks by in a car. She walks there because she's on her way to meetings at the Decatur House, catty-corner to the White House, about historic places, their preservation, historic architecture. And she's doing that at least monthly. And she is someone who studies this. It's important. This isn't something that just flew on her screen when this construction started. She has been studying this for years and years and years as part of her profession, but also now as part of her volunteer role and her responsibilities as a trustee, right? And it's right there. The Decatur House is right there, and it's part of the President's Park. So two things on that, Your Honor. First of all, I think the fact that she says she sees it because she's going to meetings at the Decatur House is actually right in line with the language from EDF about incidental viewing, right? She does not say, I'm coming because I want to enjoy this view. She's saying, I'm coming there anyway. I have reason to be in the neighborhood. She has meetings, and she has the walks that she takes. And as an architect, she takes it as someone who is there to look at architecture. And this is a very, very special place. It is. And I think that the fact that she has very strong views and opinions about the architecture... It's a connection to it from her profession. Yes, but it's different from saying, for example, you know, my research involves taking pictures of this beetle and studying the beetle, and I'm not going to be able to find the beetle anymore if these government actions are taken. I think that is a much more tangible impediment to something the plaintiff wants to do, government standing in the way of that. If it's just, I'm just not going to enjoy this as much, I'm not going to like this view as much as I used to, I don't think that crosses the line. So I think at that point, we're opening the door to anyone who says, the government's doing something, there's a visual manifestation of it, and that upsets me, right? So imagine, you know, I don't like the picture that they've decided to put on the $10 bill. And I'm really into currency, so I care about this a lot. I don't... I think this court would say that's a generalized grievance, classic generalized grievance. I was surprised... Oh, please go ahead. You may have... MARY JO GIOVACCHINI I mean, it seems under our precedence, it may not be that difficult for a different plaintiff or member of the trust to make allegations that would satisfy our standing requirements, because they're not that rigorous. Even if these declarations do not. So I'm wondering if you can speak to germane-ness and whether this is germane to the trust's purposes, because even if that's another, you know, plaintiff were to come along, I think that, you know, as I've already written, that there are some problems with germane-ness. RANDY GOLDFIELD Sure. Absolutely. And I agree, we're not taking the position that there's no possible person who might have standing here. It's possible. I don't think she's cleared the bar, but, you know, I'm not saying it's impossible for somebody to have a real injury. But I do think germane-ness is a separate barrier here, because the trust is a congressionally chartered entity. Its purposes are set forth by statute and enumerated. And that's in 54 U.S.C. 312-102, subsection B says, the purposes of the national trust shall be to, and then lists four things. And the trust does not argue that this lawsuit or the White House implicates any of those four things. I think that's dispositive. They point to subsection A, which speaks much more generally about why Congress established the trust. And that has more general language. But I think you have to read the statute as a whole, and subsection B then manifests the specific ways that Congress wants the trust to carry out those broader policy goals. And those do not relate, undisputed, and it was undisputed below, those do not relate to this case or to the White House at all. And so I think that's a separate basis for rejecting standing here. Can we get back to your slides, so people could have standing to object? Imagine, what would the, who would the declarant be? So I'm a little reluctant to give them ideas, but I think, for example, if you had somebody, let's say somebody who lived next door and was bothered by the noise of the construction. It's a little bit more analogous to a common law nuisance claim. I think that type of injury before this- Is there anyone to be, I guess I didn't clarify my question, the visual harm? The only real example I could come up with is, imagine that somebody's view was going, let's say their property, you know, the view from their property was going to be obstructed by the new building, and that could actually impact the property value. I think that would be a view-based harm. That's a monetary thing. That's not a visual injury. So I'm asking you, is there any visual injury? I would say no. I don't think visual injury from a new structure is going to qualify. Imagine you're a descendant of the slaves who built the original White House. So I'm talking about the center mansion, not the wings. And future president says, we need to make this safer. We need to harden it and make it bigger. And all the new modern security measures for protection, we're going to bulldoze the White House. And by using that phrase, I mean the mansion itself. We're bulldozing the mansion and replacing it with steel and glass, special glass, skyscrapers. Could a descendant of a slave who once a month walks by, looks, contemplates a sacrifice, feels a connection to it in that basis? Soon. Just because it's changing. It's changing. You're knocking it down, and you're putting something in its place. I don't have that historical connection to it. What I would say is, I think that person, if they sued before the demolition happened. No, no, no. Everything's exactly the same, because there wasn't notice of the demolition happening, so they couldn't. They thought there was going to be a public participation process, which there wasn't, so they didn't have a chance. Same as this did. I mean, if the hypothetical is that the White House has already been bulldozed, then I don't think somebody would have standing. As long as it doesn't move fast enough, nobody has standing to challenge it, even if they have that type of personal connection. So I do think that that is correct, that the injury, it becomes non-redressable. I will say... I'm not talking... Redressability is a different question. I'm asking whether the descendants of the slave, or a descendant of a slave, who routinely walks by and looks and appreciates and values their ancestors' work, forced work, does that visual... The loss of the ability to see that sacrifice that was made, does that count as an injury in its own right? Yes. So I'm trying to answer your question. I think that if it predated, right, if the suit predated the destruction, then somebody could say, the demolition is going to impact my ability to see this thing that has special meaning to me. And that would be much more analogous to the environmental damage, if that's gone and it's done, and that part of the injury is not redressable. I think you have answered it. The answer is no, they can't sue as long as the government goes too fast before anyone can file a lawsuit, or in fact says there's going to be a public input process, and then moves immediately, quickly before that process even starts. So...  Yes. So you... Yeah. Okay. So just move fast and break fast, and nobody has standing. But let me push back a little bit, just to the extent there's a suggestion about what happened here. I know there's a dispute about whether the initial announcement said that the old East Wing will be retained or not. So I'm not trying to quibble with that. But it is certainly clear that it was announced that a very large new structure was going to be erected. That was announced in July of 2025. And they did not sue in August, or September, or October, or November, until December. Okay, so let's... And their injury is not... Was it not said that the White House president was going to go through a public participation process, get public input on this proposal that was being made to build this ballroom? Is that correct? I don't remember, but that was... That did happen. That is in the record. And that did happen. No, after the fact. After the fact. After the demolition. No, no. It was part of the original announcement, around the same time as the original announcement, that there was going to be this process. So if someone had sued right then, I expect the Justice Department would have come in and said, it's not right. We're having this public input process. And we probably would have been asked to file joint status reports updating on what's happening with the project. But we didn't. We can't. They don't have standing. We can't have you do joint status reports. We don't have jurisdiction. I think that if the claimed injury was what the claimed injury is now, which is, you're going to build this big new thing that is going to overshadow and therefore harm the architectural statement sent by the White House. That was very clear in July, because... I thought there was going to be another avenue pre-lawsuit one. I mean, we're lawyers. Lawsuits seem fine to us. But to people who are not lawyers, if there's another avenue for raising their concerns first, they're told there's going to be one, and then there's not. It all just happens precipitously. Then that's a problem. I understand your... I think I understand your argument that you have to go right away. Okay. You can't have any visual loss in the fact that you no longer are able to see a historic site built by your ancestor. That's gone. Your Honor, I'm not seeing... I apologize. I'm not seeing in the press release that there was some statement that something was going to happen before this was constructed. That may be somewhere else in the record, but in July... We committed to working with the appropriate organizations to preserve a special history of the White House. Yeah, and they had an opportunity to comment, and they did comment. The National Trust participated in the NCPC process. They've submitted their comments on the design, which was, at the time, that was their concern. It's too big. After the disruption. Right. And the complaint that is in Hoagland's declaration does not talk about the old East Wing, right? Her injury is not, I really loved the old East Wing. And now I can't see it anymore. That's not in her declaration. And her declaration barely mentions the old East Wing. She says, this new structure is so big it's going to overshadow things. That much was clear in July. I think the fair reading is that there was symmetry, that you're going to have... That was the imbalance that will come from the new colonnade, not just the Baltimore colonnade. I guess it's going to be really long because Baltimore is far away from the White House. But so the symmetry is gone. The simplicity is gone. Both those to call it a ballroom. It's all gone. It's going to be unbalanced. And it's not going to reflect the plan. Not going to be the same sort of architectural appearance, the messaging. And just to get back to sort of the big picture legal point, our position is that that is not a cognizable injury under Valley Forge, under EDF, under Reliance. That is a generalized grievance. You don't like how something is going to look that the government is doing. And that's the same for the descendant of the slave. Yes. I don't think it depends on the particular connection that one has. The government decided to move very quickly and bulldoze the Statue of Liberty, the people who, ancestors, that was the first thing they saw coming to this country. But the government moved too fast. Nothing can be done. I think that's right. It has. If there can move to the merits. No other questions on standing. Thank you. So just a little bit of set the stage for the merits. The White House does have a unique dual role. It's both the home and office of the president. It's also designated by Congress as national parks. And so that's why there are two sets of statutes that address the area. There are two sets of authorities. There are two sets of funding, two streams of funding. And so that's why we've addressed both. But the trust says in their response brief, look, even if you're right about 105D, the money that you're using is coming from the National Park Service side. And so you still need to be right about the National Park Service Organic Act in order to prevail here. And so I'm inclined to just jump right there because that in one shot takes care of both the authority and the funding. And I'm, of course, happy to answer questions on 105D as well. But I think the National Park Service is a little bit cleaner because it hits both of the aspects of the project. The NPS Organic Act for over 100 years has authorized the Park Service to promote the use of the national parks. And one of the ways the National Park Service has always promoted the use of the national parks is by building things in national parks, welcome centers, sports facilities, comfort stations, administrative office space. The declaration on that is a JA 401 that gives examples. So, counsel, you might it does seem like maybe you have a decent practice-based argument. Do you have any textual argument that given the statute that says you need express authority to erect structures in the District of Columbia, that the NPS Organic Act gives that express authority? So, I would think it does give the authority and even the district court sort of read. Right. But even on your argument, it is implicitly granting authority to construct buildings, right? It says promote the purposes of the parks. Yeah. I mean, specifically talk about construction of anything. That's right. It's included within the concept of promoting. And for 100 years, that's how they've carried it out, including in the district. As against the 8106 statute that says you need express authority from Congress to construct within the District of Columbia, I think you need an argument that that statute does not apply, right? Because the Organic Act, again, has been understood implicitly maybe to authorize construction. But I think you have to agree it doesn't give express authority to construct anything. So, I wouldn't. No, I don't think I do agree. I think it's included in a broader term. I don't think that means it's not express. I think it is. To promote the uses of the National Park Service equals express authority to erect buildings. Yes. That's our position. And that, by the way, that is how it was understood pretty much at the time, right? So, we have this exchange that we identified from the then director of the D.C. Parks general grant, major grant, excuse me, related to general grant, where he explained somebody asked him, you know, how are you allowed to build things in the parks given this statute? And he said, no, no, we asked for that language. That's there to prevent other people. This was 15 years after the statute was enacted? It was about 10 years. I'll give you a decade after the statute was enacted. And it was in a statement by someone who very much wanted that authority. It wasn't a legislator, even though even postdoc legislator statements. This is somebody who says, this is about whether I have authority. And guess what? I'm here to tell you. We had a conversation. We have the authority 10 years after the fact. What's your best case of that has any relevance whatsoever in statutory interpretation? Well, I think it's that plus then 100 years. To that point, okay. So, do you have any authority that that is relevant to our statutory interpretation task? I think that near contemporaneous understanding is relevant, yes. And I think the practice is also relevant. What's your best case? Well, I'm surprised this is the Justice Department's view. I'll give you 10 years. I'm not good at math. 10 years. Statement by person claiming authorities that seems to be constrained by the statute. Is relevant to our statutory interpretation, yes. So, I just want to be clear, though. I'm not saying he said it, we're done. My point is, it's a consistent practice that since the enactment of the statute. So, if Congress had responded to him or otherwise said, no, what are you talking about? That's not what we meant. Or if they had not then continued. Congress's job is to respond to everybody randomly saying things in a hearing. No, no. But Congress. They didn't legislate. No, but Congress did then subsequently continue to appropriate tens of millions of dollars annually for NPS to do construction. And NPS then used that. How much of that was for construction on, in President's Park or on White House grounds? Or even in the District of Columbia? Because there's this, you know, the statute that Judge Garcia referenced is limited to the district. It doesn't affect what NPS has authority to do nationwide. That's correct. It may well be what this person was talking about. Well, no, this person was talking about Anacostia Park in D.C. And referred to the appropriation that had been made, which was a lump sum. It did not address the Fieldhouse. And they said, no, that's good enough. And then we have the declaration that J401 talks about the examples of construction in the D.C., specifically in Parkland in D.C., and gives examples of lots of structures that have been built over the ensuing decades, never with any controversy, and that did not have specific project by project approval from Congress. Yes, they had money. They had to have money to build. So that either came from a lump sum annual appropriation, which, by the way, NPS has this year too, or it came from the donation authority. Which is where I was going to go next, because these things are tied together. The NPS has authority to build. It also has authority to accept donations for purposes of the park system. And they've used that. I mean, under the Economy Act, maybe NPS can do this. But this project is being built by EXR. So an EXR under the Economy Act, in order to take NPS funds, has to be able to do the building itself. So where is EXR's authority to do the building? Under the Organic Act, if you're not going to be, if you're not relying on 105D. Well, we can look at 105D for that piece, but because of the money piece is sort of the starting point, that's why I started there. But you're suggesting that the Organic, the NPS Organic Act independently can support the project. And so I think to make that argument, you have to have some account of why EXR has its own ability to do this building separate from 105D. I mean, that's, you started with that argument. And so I didn't see anything in your brief explaining, did NPS delegate this authority to EXR? Is it able to delegate that authority to EXR? I think you need, there's like a missing connection, if that's going to be an independent argument. So let me try to address that. I think there's two questions. One would be, could NPS do this? And then the second question would be, even if NPS, assuming NPS can do it, can they contract with EXR to actually manage the project and oversee the building? So just on the first, even if we didn't have the second piece, we still wouldn't be able to support the injunction as it's written, because the injunction says no dependents can do anything with this project. So even if the court thought there's some problem with the Economy Act piece, I wouldn't support this injunction. And the second point I would make is they never challenged the Economy Act transaction. That was not their argument. I don't think there is a live, non-waved argument that the Economy Act transaction is problematic. I don't think the Economy Act transaction can be problematic. But you're suggesting it's an independent basis to uphold what's happening. Yeah, and so I do think that Economy Act allows for it. And we have examples at JA411 and then JA419, we have the declarations from NPS and the White House about how they use the Economy Act all the time to engage in transactions like this. Now, yes, you can't use it to evade some sort of restriction, right? So NPS has to be able to do the project. NPS has to have money for the project. And then there can't be some prohibition or restriction on the supplying agency's ability to do it. So you think in the Economy Act, the receiving agency's ability to do it just means that there's no prohibition on them doing it? It's two things. The practical ability to get it done, which I don't think is contested. They're doing it right now. And then no prohibition, no specific prohibition. Is there any case law interpreting the Economy Act that way? Or is it like part of like OMB practice or something like that? It's the Red Book is really the place that I look. And it says that's what authority means. Yes, it has this language about you can't be a restriction on the supplying agency. And they cite examples from comptroller general opinions going back to the 30s and 40s. Just to clarify the argument for me, if there was a requirement on this theory that ESR has affirmative authority from somewhere to lead construction projects, is there any such source of authority? Yeah, that would be 105D. So 105D is the authority that the White House uses to do all sorts of projects in the White House. If on the line of questioning Judge Rao is asking for the NPS Organic Act to be sealed off, we're asking whether ESR has, okay, so you would have to rely on 105D in order for ESR to be able to lead the project? If the court thinks there is, there needs to be some additional affirmative grant of authority to the supplying agency, which I don't think is true under the Economy Act or the Red Book. The only place that could come from is 105D. I think so. I mean, it's this sort of routine. Like the Economy Act transactions are done. I know this project is very big, but the Economy Act transactions that have been done just over the last 10 years, you know, we have the fence, we have the window. I mean, there's all sorts of things in the White House where they are using the Economy Act to make sure that the project is being run by the entity that has the sort of best position to do that, whether that's the Secret Service or the Park Service or some other component of the White House. And I don't really know why the plaintiff has any cognizable interest in which part of the executive branch is signing the contract. Sorry, I'm just trying to understand this Economy Act. So in your view, it always has to be something NPA or Interior has the authority to do. They have to have the legal authority so that they could sort of just do this job themselves. Yes. Okay. But if and then when they contract with another agency, this case or another case, just trying to understand this. And let's imagine the other agency doesn't, hasn't been given any statutory authority to do anything remotely like this. There's not an express prohibition, thou shalt not. But Congress has never conferred this authority on the agency.  Is my argument, but tell me if I'm wrong, is that that acting agency, performing agency could still do it? Because are they, do they essentially become part of, are they a contractor just, are they like a government contractor if they lose their agency status? Or do they become sort of part of Interior, part of that agency? I mean, it's an internal, intra-government. The agency, the agency actor, Interior agency, agency actor just in their capacity performing this contract. Obviously not in anything else they do. I think they're acting as the agent or contractor of the agency. What if that should for one agency to be the agent of another? That's not how Congress set them up in the first instance. Right. I mean, I think that's just, that's just the way the economy acts. If there's something like DXR, do they become an agency? No, I don't think it changes their own status. They're just acting pursuant to the economy act transaction that is transferring. It allows one agency to contract with another agency. And DXR is not an agency, I believe is your position. That's right for APA purposes, but there's a different definition. Oh, okay. Yeah, although they have not, that hasn't, I think it's just defined differently, but. What's the difference in the definition? I don't, I don't recall, Your Honor, they have not challenged that. My position is that DXR is an agency. For purposes of the economy. According to the APA, as it's performing this action, or just. No. No, an APA, they're an agency only for, sorry, so they're not an agency. We know they're not an agency for APA. We know they're not an agency for FOIA, but they are conveniently an agency. You're not sure based on what were in the definition, but some word in the definition makes them an agency under this statute. Are there any other statutes DXR is an agency for? I don't, I haven't cataloged them all, but there are. There's a catalog of them, there's lots of them where they are? Oh, I, no, I haven't. My people have been the opposite. I haven't cataloged all of the definite, all the statutes that use the term agency, how they come up, but there are differences among them. This would perhaps be the first time DXR would ever be an agency under federal law, or I could be wrong. Maybe there's other ones where they have them. I don't, I don't think so. And in fact, again, the declaration from the White House gives examples of Economy Act transactions that components of the Executive Office of the President that are not agencies for APA purposes, and everyone acknowledges, has long carried out the transactions under the Economy Act. Maybe, so there's no cases on this, but I mean, we have a statute to interpret here. There are cases, actually. There are some cases that address it. It just hasn't been raised in this case, so it's not briefed in this case. So my understanding of your position is, as long as, in this case, NPS has the authority to do this, it doesn't matter that EXR, let's assume EXR couldn't do it. Right. Under 1FID. Let's assume it had no authority, not a prohibition, but just no authority at all. There's no 1FID. They could still do it. Yes. So the Economy Act has the capacity to give authority to entities. Well, it's transferring, I mean, it's transferring within the executive branch who is going to be carrying out. There was an office in the SOC that had some people who knew a lot about construction. You could have them lead it. Well, you have to make certain findings. I mean, if the findings were made, then yes, it could be any agency. The findings have to be made that all of the requirements of the Economy Act are satisfied, which include that this is the best, you know, this is a better position. It's more efficient. The agency has to make those determinations. The agency here did make those determinations. By the way, they were never challenged. So they're not even in the record because that was not the agency action that they ever challenged. But the agency did make those determinations that all the requirements of the Economy Act are satisfied. And as a result, that the sort of supervision day-to-day could be done from within the White House, which makes a lot of sense given the personal involvement of the president in the project. I was going to move to 105. Oh, there's one more question on this. Does it have to be some entity within the executive branch? Say they're going to do a nice library do-over in the White House, and they want an expert from the Library of Congress to really be the one that executes it. Is it only the executive branch or is the definition sort of any governmental office? I don't know the answer to that, Your Honor. I apologize. The only other thing I wanted to say on this was that the precedent for using the donation authority for projects on White House grounds dates back at least to the 70s and President Ford's pool, which gave rise to the OLC opinion that said, yes, you can do it this way because the White House is designated as a national park, falls within the scope of the Organic Act, triggers the—unlocks the donation authority that you can use, and we're good. Nobody has really questioned that, I think, since the late 70s when that opinion was issued. The trust—the trust actually doesn't—so the district court said, we're wrong. NPS doesn't have authority to construct at all. It only has authority to build insofar as Congress appropriates funding specifically for building. I think that is just fundamentally a misunderstanding of how the appropriations process works, and actually the best place that I would— Was the district court saying—and maybe I'm wrong—was the district court saying just for the District of Columbia or more broadly? More broadly. He said there's no authority to build under the Organic Act. It only comes from the appropriations. I would point the court to the brief that was filed on the other side by the members of Congress. They lay out the two-step process on pages three to four of their brief. First, Congress authorizes an activity in enabling legislation, Organic Act. Then it funds the activity. You don't fund something that isn't authorized, and so I think the district court just got this wrong. The fact that Congress annually gives NPS, you know, $80 million for construction actually proves that the Organic Act includes the authority to do that construction, and by the way, that wasn't the trust's argument, so I can't blame them for that error. They didn't make the argument that NPS can't build. They only made the argument below that NPS can't build this because they said this project was inconsistent with the values and purposes of the park unit. Which is a very different argument, not what the district court said, and I think not a meritorious argument given that NPS did a thorough analysis of that question, wrote a whole determination as to why it was consistent with the values and purposes, and they never really tried to grapple with that or show that it's wrong under really any standard for view that would apply. So I think this relates to the subject you were just discussing about appropriation authorizations and authority to act, and if we move to 105D, could we just hear your response in terms of the text of the statute to the trust's argument that 105D is just an appropriation authorization and not organic legislation? So absolutely. The way the Red Book explains how the process is supposed to work is they say there's actually three steps. First, you authorize the executive to act. Then you authorize Congress to appropriate funding. Then Congress appropriates funding. So there's supposed to be three steps. It doesn't always work that way. Okay. So in this case, we have really what we have in the text is the second and then the third. So it's written as Congress can appropriate funds. The one is just implicit. Can I just have a specific question about that that maybe you can help with? The first three subsections of 105, they all start by saying the president is authorized to do X, Y, or Z. Z does not say the president is authorized to make improvements. And as you know, we usually try to give some meaning to such stark differences in language. And in your view, is there any difference? Can you give us any meaning to ascribe to that difference in language? Yeah. So I asked the same question. And it seems like if you look at the legislative history for the 1978 enactment, Congress was trying to deal with two very different problems. An issue about personnel and sort of who the White House can hire. And then this question about improvements and things that had historically been funded through annual appropriations, but had never been formally authorized through an authorization bill. And so I think the difference is that as to D, Congress was based on the historical precedent, basically presupposing that the president is going to do these things. It's just a question of we need to make sure the money is there. Whereas it was a different with the personnel. I think they were much more wanted to ensure the president can hire who he wants. That had been a source of controversy that was just differently situated from D. Because there is a, that does almost entirely fit with the story the trust would tell, which is Congress wanted to authorize the president and doesn't really care all that much about who he hires and how much he pays them. But it sure cares a lot about what is done to the White House. And so it's going to retain more of a leash on the kinds of activities the president can undertake. Well, they certainly do retain more of a leash because you do need the money, right? So you do need, again. So in this year, as you know, there was an appropriation of two and a half million dollars for maintenance and, you know, related items. Right. And so one coherent view of this statute is 105D allows, it sets the world up so the president is available to act, just as you said, when he receives an appropriation for the purpose of 105D. But that he doesn't just get to go broader and make other projects that aren't funded by appropriations. What's the answer to that? So look, I think there's two answers. One is we have a different source of funding. And so it doesn't matter, right? So yes, the two and a half million goes to 105D. But the NPS source is and always has been a separate source. And Congress has always recognized there's two accounts that can be used for the White House. If we're just looking at 105D, I think the better way of looking at the relationship between the Authorization Act and the Appropriations Act is that the Authorization Act is authorizing the activity generally. And the Appropriations Act are then providing the funding for that activity. And by the way, that's also how the members of Congress appear to read it in their amicus brief. So they do not make the argument that the trust makes that this doesn't authorize any activity by the executive. They say it authorizes alterations and improvements, but that should be read narrowly because of the other words. But there's another meaning of the statute, that it authorizes the president to act when and only to the extent that Congress appropriates funds. So he's authorized to make $2.5 million of maintenance changes to the White House. This cannot be a source of authority for demolishing and replacing part of the construction. One could read it that way. I think that just so conflates the two steps a little bit. So that would be how we would read it if there was no 105D, there was just an annual appropriation. We need to read into that some sort of authority to use the money, but it's limited to that amount of money. I think the point of having the framework legislation is to do something more general. And it sort of meshes with the way the congressional process... It goes back to my first question, which is, on your view, there is no difference between this statute and one that said the president is authorized to make improvements. And on this alternative view, there is a difference. There's an implicit authorization, but it is cabined by the extent of the appropriations. It seems like the trust has a fairly strong argument that we have to give some difference to this choice of language. Your Honor, I think that just the better way to look at it, given the way Congress works, is that we need to treat the authorization and the appropriation as distinct. And by the way, that tracks how Congress... From a legislation standpoint, the 105D doesn't come from the Appropriations Committee. That comes from the committees with legislative jurisdiction over the issue. And then it's a separate question of the Appropriations Committee then decide how much we're giving. So I don't think we generally read the authorization bills as limited by the appropriations bills that come later from a different part of Congress. We read the appropriations bills as limiting the amount of money that Congress is providing for a set of activities. Now, this only really matters... But here, Congress... I mean, first, you're all assuming that that 105D is an authorization of a president, as opposed to simply an appropriation authorization baseline for Congress. Right. But here, Congress each year says, not only here's your money, it says here's what it may be used for.  And your argument is that that doesn't matter, that limitation. You agree that you're bound by those limitations using... For that money. That money. Yeah. So your argument hinges entirely on reading 105D as an authorization to the president at all. The 105D argument rests on understanding 105D as providing authorization to the president, subject to what money may be available. And yes, the money that Congress made available this year under 105D is more limited, both in amount and in uses. And that is binding. But to the extent there's another lawful source of funds... No, that's exactly... But you have to have another... You need to have an authorization somewhere. And so if the authorization you're relying on... Because we've talked about different things. Yeah. Is it your reading of the MPS Organic Act? It's two. 105D plus the Economy Act or 105D? So we think we have two independent sources of authority. Yes, but if... So one is MPS Organic Act, which is then executed in this instance through the Economy Act, and the other is 105D. But the 105D authorization doesn't get us the money, right? The 105D, let's even assume that it's an authorization to the president as opposed to appropriation authorization to Congress. So I'll give you that. It is textually limited to your list of verbs... Right. ...at the executive residence, for the executive residence at the White House. Correct. Is the East Wing or was the East Wing part of the executive residence at the White House? Our position is yes. On what basis? And that hasn't been disputed. So again, it's another issue that is not briefed. I know. Based on the... We're just trying to figure out exactly... There's a lot of pieces here, and you need authorization, but we... Right. ...it's textually not in there. That's right. So there's two issues. One is the verbs, and then you're asking about the scope of the executive residence.  The object. So based on the history of how 105D appropriations have been used over time, our position is that it includes the wings, okay? They never challenged that. Separately appropriates money to GSA to maintain the wings? That still would be your argument? Yes. I mean, they can appropriate money for different things to different people, but 105D... My understanding is 105D appropriations have been used for the wings in the past. We have to read executive residence at the White House as including East Wing. I don't think you have to read it that way. If you read it for this, if you... I understand you would still say we got the original background caveat, but... I'm just making the point that... Just for the 105D point. Yeah, just for the 105D point. I don't think the court has to wade into that because it hasn't been disputed. So I don't think you need to reach questions that they have never pressed. But it is true that we felt comfortable that that encompassed the wings based on the historical practice. What historical practice? That money that has been appropriated in the past under 105D has been used for various projects. For the records center at this point? No, there's no record because it's not in the case. You said... Oh, I'm not asking in this case. Sorry. I'm saying you have to look at this record where the government has long said and taken the position that executive residence at the White House, that phrase, includes the wings. So if we were to brief that, we would probably submit a declaration. You asked this. I confirmed that it was... Yeah, I confirmed that that was true. I don't have the details because we never put it in based on the discussions with the White House and their office as to how this has been done. And if it had been raised, we would have put in a declaration and evidence. Ms. Roth, so one question I had is if 105D provides authorization for this type of building, does it also then just sort of by its terms include authorization to use the NPS gift funds? So I don't think we can use the NPS gift funds unless the project falls within the scope of the NPS statutes because that is what the gift funds have to be used for purposes of the national parks. It happens to be that Congress chose to designate the White House as a national park in 1961. And as a result of that, the gift funds can be used, like the OLC opinion explained in the 70s, for projects on White House grounds. And so that's how these things come together. But for EXR to have authority to use the NPS gift funds? EXR doesn't have the NPS gift funds unless NPS makes a determination that this project would satisfy its statute. And then it can transfer the funds under the Economy Act to support that project. And if we thought the Economy Act alone did not give EXR the ability to do that, then you could rely on 105D as the authority for them to use those NPS funds. I think 105D would be the background, sort of, here's what this entity does and can do. And there's nothing inconsistent between that and the Economy Act. But again, the Economy Act was challenged in this case. So again, I think it's important to stick to the arguments that the Congress made. This question is separate from the Economy Act. I just want to make sure I didn't misunderstand something you said. I understood you to just say that if we concluded the NPS Organic Statute does not authorize this, and all you have is 105D, you agree that you cannot use the NPS gift funds under only 105D. Is that correct? I just want to understand. I think that's right. Although, again, not to be a broken record, they didn't challenge the funding mechanism. So a lot of this is like we're spinning out. Well, to be fair, they have consistently argued that you are limited under 105D to the funds appropriated under 105D. And it actually sounds like you agree with that. You just say it doesn't matter because the NPS Organic Statute is giving you the authority. So I'm not disputing that to use the gift funds, it needs to advance the purposes of the park system. And that's the question. I don't see any serious argument that it doesn't. It's being used on a national park, filled something on a national park that the Park Service determined would advance the purposes of the park unit and wrote a 27-page analysis of why that is that they've never contested. So I think but yes, by its terms, the gift statute authorizes donations for that purpose. So they have to be used for that purpose. Just to be clear about the implication, this means that if we thought that notwithstanding your able arguments, 8106 means you cannot construct structures within the District of Columbia, that's the end of the case. Because NPS cannot build and 105D doesn't get you access to those funds. If you thought that 8106 prevented construction, unless Congress specifically authorized the particular project at issue, which is just never how it's been done for 100 years, then we would confront the question of whether they can enforce that statute in this case even though it doesn't confer rights on them under Global Health Council. Okay, I understand. So I think we would get to there. But the District Court didn't see, the District Court really didn't distinguish or didn't read 8106 as an additional hurdle. District Court, as I read the opinion, the District Court said you don't have authority under either 105D or the Organic Act, and therefore I don't even really need to talk about 8106, but, you know, sort of like confirms. But if you did have authority, then you would, 8106 wouldn't interpose an additional barrier. Maybe I should talk about the equities. Let me just add one to make sure. When you're saying use of the gift funds, are you talking about by NPS directly or are you talking about via the Economy Act or both? I just want to make sure I understood your answer. I think I'm saying both. But, I mean, the donations can be accepted by NPS if they're for the purposes of the   So then NPS has to make that determination. Well, there's more determinations under Economy Act. I just want to make sure I understand. And then it's— You said gift funds. You weren't only talking Economy Act. You were talking about— Right, there's two— —Avenue. There's two— Then we're reading the Organic Act as authorizing NPS, do your view, to do any construction at all on White House grounds. If it's consistent with— It has to be consistent with the Organic Act's limitations. Which includes— Yes, which includes they have to make a determination of non-impairment and no significant impact and so on. There's a whole series of things they have to do. But yes, then they can build. It also has to be consistent with the— I'm not going to be able to get back to another statute. We don't need to bring that one in. It also has to be consistent with the 1961 legislation that establishes the park as a national park. That has certain provisions in it about how we want you to keep the principal corridor and rooms in the central mansion. And, you know, the paramount importance should be given to the use of the site by the president. So, of course, this project is consistent with all that. If you could imagine something that wouldn't be, and then we would have a different problem. All right, I'd address the equities. I don't think you have too much for that. Well, maybe we'll have more questions on that, too. But are we done? Just to make it easier for you. Thank you. On the merits? Or did you have more? Okay. All right. So the final point, our final argument, is that even if the court were to conclude that there is or may be standing and that the trust has a claim on the merits, it is still an abuse of discretion under Winter to grant injunctive relief, given that the balance of harms and public interests are so lopsided in favor of this project. And it's really, like, on the one side, even if we think it is sufficient for Article 3, we are talking about one person's architectural preferences for the site. And on the other hand, we have senior officials in the military and the Secret Service saying, we need to build this. That's simply the way standing is shown for the National Trust itself. So it's the National Trust. Sure, but they haven't submitted other evidence. I mean, this is what we have. There's not one portion of the plaintiff here. It's the National Trust. The plaintiff is the National Trust. And the harm that they've substantiated as an association is the harm to Hoagland. But whether it's one person or multiple, it's an architectural preference on one hand, and the safety and security of the President of the United States on the other hand. And that, I think, really mirrors Winter, where the court said, look, this is not a closed call when you put these things against each other. We have evidence. Again, it started as classified evidence, and now more of it is in the open. But we have evidence here that the old East Wing was not adequate to protect the safety and security of the President and others in the White House, leadership of the executive branch. And that this project is designed to update those protective features to ensure that they are capable of withstanding modern weaponry like drones and other modern methods of attack that are very serious. And the entire project was designed with that in mind, both the below ground components that have been discussed, but also having a structure on top of them that is sufficient to protect them and to protect the people inside so that the President and the leadership of the government have a place to go that is highly secure in the event that there is an attack. And that is just—I just don't see how that can be compared to the architectural preferences of the trust or its members. Even the district court ultimately, after this court's remand, sort of acknowledged, yes, there will be some things you need to do that you can do for national security. You know, put a structure on top. You know, you need to protect the executive mansion. You're going to put a structure there. But that sort of compromise is both unworkable and inequitable. It's unworkable because I don't really know what it means to say you can put something on top as long as it's not the ballroom. I mean, this structure was designed specifically in terms of the size, the materials, the layering, the amount of steel that's being incorporated, right? All of that is designed to protect what is underneath and to protect the people who are inside. And from an equitable standpoint, I don't know why it is helpful to say, build something else, right? That's not better from Hoagland's perspective if there's a big building that we can't use as an event space. I don't know why that advances the equitable interests either. Mr. Roth, one of the things that the trust repeatedly states in its brief is that the government has shifted its position about how the ballroom and the underground facilities are integrated. And they make a lot of hay over that. And I'm just curious what the government's response is. So they are taking it out of context. What happened was, at the time of the PRO and the PI in December and January, the work that was being done at that time was underground work. And we said, there's a national security imperative for what we are doing. Don't enjoin the work that is going on. And the trust said, wait, if you let them do this underground work, and then the Commission of Fine Arts says, we have some feedback on the structure, or the National Capital Planning Commission says, we want you to change something. It's all going to be locked in. And they won't be able to make any changes because of what they're building underground. And we said, that's not true. There are little design things they want to change. We'll be able to change them. In fact, we did change them as a result of the input from those commissions. And so there's no need, if that's your concern, that is not a basis to hold up what we're doing. We've never suggested that the national security. Design things. Your representation, which the district court expressly relied on to design a TRO, is that the underground work would not dictate the structure that goes on top. That's not a little design tweak by somebody. We said in the declaration, we provided a declaration from the architect or the engineer that said, things like moving windows or doors or stairs, modest changes to size. Did the council say that the underground work would not dictate what goes on top, the structure that goes on top? He may have used that terminology. The actual evidence in the declaration was pretty careful in how we framed it. Denying that the work being done below ground will dictate the height and width of the building above ground.  Below ground construction will not necessitate any specific above graded design. Right. The design. It was focused on the design. And it was focused, and we did say modest changes in size will still be possible. There's nothing here to suggest that changes in the ballroom would be impossible or that anything irreversible would occur during underground construction. Right. And I think the point is, it's not. So that's not where the staircase goes. I mean, that's what the district court said. The whole, you talk about their timing here. They asked for TRO. He said, you don't need it. We just need to focus on this underground stuff. We'll fight about the size and dimensions of what goes on top later. I just think. You've got to own what you're trying to say. I think you were at the, maybe you were. I don't think you were, but you know. I wasn't at the TRO. But I was at the PI stage just a month later. I'm talking about telling district court something. District court's order says I'm expressly relying on these representations. So this is much more serious than they thought we were going to put staircases somewhere else. Your Honor, I think it's important to keep in mind that at the time of the TRO, the lead claims that the trust was pushing was you need to get input from these other bodies. And so in that context, we were saying we will be, if they have some changes, we will be able to address those. The heights and depths. Including the height, yes. But when we actually then submitted evidence, you know, a TRO was without, you know, we, that was very rushed, right? We then submitted further briefing and evidence with the PI opposition that was very clear about what would and would not be alterable. And said modest changes. And it was very clear to the district court. Well, it was clear in the record. I'm just reading the district court. I was not in the room. But the district court's decision, I credit that the district court, you know, judges take attorney's words very seriously and representations from the government, especially most of all. And the district court, I said it again on our remand, you know, felt that there had been sort of a bait and switch going on here. Now, you have your side of the story. They have theirs. But, you know, that's not something, that's something we take the district court's determination very seriously. And we don't, we aren't going to go back and lecture the district court on misunderstanding representations made to it. No, but I think the court can and should look at the declarations that we submitted, including the classified. We've provided the ex parte declarations that before even the first denial of the PI made clear the above ground structure is critical to shielding and protecting what is beneath. Now, that doesn't mean nothing can be changed. I'm not switching around about who's running this project. So that also, respectfully, I think the trust didn't understand what we were saying, but I don't think there was any switching around. In the very first filing, we made clear the project was being run by EXR, but NPS had made the environmental assessment. They had done the finding of non-impairment. We attached all of those to the record. And now we're told under the Economy Act, in fact, this is an NPS project. EXR is just its agent. EXR can't be running it if it's just the agent. It's the principal that runs it. And so you pay no attention to NPS. They don't have anything to do with this. Did you tell them up front? This was NPS's project. This was NPS's contract. And EXR is just its agent. So we said in January, in our filings in response to the preliminary injunction, that the funding is coming through the Economy Act from NPS. That's different. And the reason it's... I don't think it's different. That's the key point, is the funding is coming through an Economy Act transaction from NPS. So we cited the Economy Act. We said that's where the money's coming from. And the only reason we didn't say... I don't think it's correct to say it's an NPS project because, again, we've consistently said we have two sources of authority. So when you look at it from the NPS side, NPS is making the determinations that it is authorized to do it using the Economy Act to move funds to pay for it. If it's subject to the APA... Yes. ...it's under the Economy Act. Yes. It's under the Economy Act. Yes. And then you guys told the district court that you can't have an APA claim against the Park Service as indisputably not directing the project, and there's no Park Service action that the court could set aside under the APA. That's not true. If their Economy Act determinations and the findings they had to make could have been reviewed under the APA. That's just wrong. So they... I mean, no dispute that was said. I'm just reading from... That was in the brief. The trust focused its motion and its injunction on... No, I'm talking about... I'm sorry. I don't want to talk about it. I'm talking about what the government told the district court in the PI stage when they said, oh, you're right. There's no APA claim here against the Park Service. I think you cannot... That has changed. You assume that there could have been an APA... I think there could have been an APA challenge if they had identified those as the relevant agency actions and sought to set them aside. But that is not what their focus was. Is that something... Their focus... Well, we were focused on their... We were responding. This was a responsive brief. We were responding to their argument. They were trying to shut down the construction. And we said, there's nothing you can do to NPS to stop the construction. No Park Service action that the court could set aside under the APA. That's a pretty strong statement. And in fact, if you knew there was a Park Service action that could be set aside under  the APA, I think it is conceivable that had they challenged the Economy Act transaction, that that could have worked under the APA. I agree. Well, I thought you agreed that, in fact, the NPS... There was previously. So all this happened before. But yes, there had been NPS action, which we told them. So that was in the declaration. The money is coming from NPS. NPS made these determinations. They never said, we want to challenge those actions. They never sought an injunction based on that. And they never sought to set aside... I'm talking about what was told to the district court. Let's hope. I think that... I apologize if it was in imprecise language. One final question. Just on this argument that the equities alone warrant denial of an injunction, I appreciate all the arguments. It seems like your best case is Winter. One, I just want to ask, do you have a case where a court has decided that the equities alone are dispositive when the flaw identified is a substantive problem with the executive branch authority? One of the things Winter emphasized was that that had to do with a procedural failure under NEPA. And you might think that that kind of situation is different because there surely is a public interest in ensuring that the executive branch operates within the law. Right. So I agree that's a distinction with Winter. I would point actually to the trust brief. So they say, they admit in their brief in this court, yeah, if you were far enough along in the construction, equity would not allow an injunction to enter. And I think that's a concession that it's not a categorical, no matter what we get into enjoying this, simply because it's substantive in nature. It's a concession that you do always have to balance the equities and look at the harms and the public interest. And at some point they say that will cut the other way. You don't need a case for every proposition. I just, if you wanted to find a case where there's a substantive absence of authority to take an action, you don't have one to direct us to. So they set a case and I'm not sure what the nature of the harm, what the nature of the injury was in the case they cite. So I'm not 100% sure on that. I mean, it comes up all the time in the election cases with Purcell, where we say, you know, those are substantive claims and courts say, well, I'm still not going to get involved in this because of the equities. They're too close to an election. But I think, you know, their concession that cost alone would be enough, I think is dispositive because if cost alone is enough, how can it not be enough when the safety and security of the president of the United States and the seat of the executive branch is under threat? Thank you. This is just one other thing that, so after those rounds in the district court with bringing stories and the district court's understanding about changing representations, by the time the discord entered the PI, I took it from the position here and back in district court that things have gone too far. This can't be enjoined. Given the safety and security arguments, if you didn't have those, it would be different. But given the safety and security, I think this has gone far. This has got to keep going. It was either you had to enjoin it, maybe the first PI, or maybe we even would have said before the destruction of the East Wing.  And now it's too late. You can't delay this. Now, so if we agree and stay this, and by the time litigation is resolved, at least we're going to be even further down the road in construction. You just imagine that you get the stay that you've requested, or even the PI is overturned on the arguments you have, and then government loses on the merits. But it's a year, year and a half from now. Would the government's view be that, okay, we can take it down? Or would it, for the same safety and security reasons, be we can't take it down? Obviously. Oh, yeah. We would oppose a permanent injunction on the same grounds as we're opposed to a preliminary injunction. Yes. And so your position is this can't be stopped by a court. Well, I think our argument is that it would be an abuse of discretion for a court to stop it. Not that you can't. If it's abuse of discretion, they can't do it. Then sure. Yes. I mean, that is our position. Because I didn't understand your sentence. You said it would be an abuse of discretion, but doesn't mean they can't. No, no, no. I think it would be error to issue an injunction. Let me ask you a straightforward question. That court, this court, Supreme Court, no court could stop the building of this. Yeah, that would. Yes. Not to do it today lawfully. Even if, let me tack into this. Assuming this is a big assumption for me. And you certainly don't want to accept. But assuming for this question. Right. Imagine you are wrong on everything. I mean, straight up. Imagine it was, I mean, statutes were as clear as could be. I'm not saying that's the case. The statute was clear as could be. Both statutes, NPS and 105. Clear as can be. You have no authority to do this. And you've done it. There's nothing to be done. That is our position. And I think that's the function of the other factors in the, in the fourth step, in the four part test for an injunction. They have teeth in some cases. I think this is the classic case where they have teeth. Because of the national security imperative. When did it become a fail complete? Was it when the destruction happened? Was it when you started doing the underground work? Which is, we're now told, completely integral and connected. And inseparable from a massive ballroom on top. When did it become impossible for courts to stop this project? I think it would have been improper to enjoin it even on day one. I do think that the equities have moved in two ways. So, if this were complete lawlessness by the government. This, again, this is a complete lawlessness by the government. Yeah. Couldn't be stopped. And on these theories, I think that's right. And Congress has a law that says. Yeah, that's what I was. Yes, I think they could. Because I think in that, what I would say to that is. If Congress has weighed the equities. In this particular instance. And reached a conclusion. I'm not sure a court would have the authority to second guess that. But if we're just talking about a general statute and application to be. I think the court would not second guess congressional decision. That addresses the equities in that way. So, they spoke specifically to this project. An independent role in weighing the equities here and making decisions. So, this is really something that can't be stopped in courts. It can only be stopped by Congress. I think that's right. Because Congress is better at weighing equities than courts are. Well, this is ultimately the claims they're raising. Are claims that sound in interbranch dispute. And I think that's exactly the type of case. Where we generally would let it play out politically. And have them resolve it. A lot of interbranch disputes here. And sometimes. And they get enjoined or not. And sometimes they affect private interests more directly. And sometimes as here. They affect private interests only very incidentally. And I think the more incidental the private interest is. The more appropriate it is as a matter of separation of powers. For this court or a court to say. We're going to let this play out in the political process. Are you arguing this is a political question though? No, I'm arguing it through the lens of the equities. Congress hasn't done anything with respect to the ballroom. Correct. Is that correct? That's correct. There are various bills pending on various different aspects of it. But Congress has not actually stepped in. And what I told the district court. Was it, you know, one thing you could do if you think it's illegal. Issue a declaratory judgment that it's illegal. And Congress can figure out how to deal with that. Given the fact that we have these national security imperatives. And that we now have a project that, like I was there this week. You know, it's well along. So it's above ground. You know, they've installed like 3 million pounds of steel rebar. Just a lot apparently. And, you know, it's well on its way. And so I think, yes, Congress would be the appropriate entity to decide. How do we balance these considerations at this juncture? No questions? Thank you. Thank you very much. I'll give you some time for rebuttal. Good morning. May it please the court. Tad Shearer on behalf of the plane of the National Trust for Historic Preservation. I was going to open with something slightly different. But I was just touched on the point that Mr. Roth just made and emphasize it. Under Marbury versus Madison. It is emphatically the province of the judicial department to say what the law is. And the government's position apparently. Is that even a lawless action of this type could never be stopped by the court. That is entirely wrong. That's exactly the court's job. In this case, it's about who controls federal property. Is it Congress, its owner, or is it the president? It's temporary tenant. And the Constitution is clear. It is Congress. And the defendants, as we've just heard, don't really have a persuasive argument on the merits as to either 105D or the Organic Act. Because if they did, I don't think it would have taken them the amount of time it did to try to explain why what they're doing is permissive. This is how the district court described it as a Rube Goldberg contraption. Because it's incredibly hard to follow. And Occom's Razor would say the easy way to resolve this is that they just can't do it. Well, Mr. Heer, why don't we start then with standing for the trust here? So I guess there are two aspects. One is whether Ms. Hoagland has independently established standing. And then also germane-ness to the trust's purposes. And I'm having a hard time seeing why Ms. Hoagland's declaration is any different from Environmental Defense Fund or Alliance for Hippocratic Medicine, where this court and the Supreme Court have found these types of harms not to confer standing. Certainly. So let's start with Professor Hoagland. So Professor Hoagland is using this resource exactly as the National Park Service intended to be used. This is a national park. The Park Service describes every one of its national parks in something called a foundation document. That foundation document says, what are the essential elements of the park? And here, the NPS Foundation document says this. They say, the White House and the Waynes are fundamental resources essential to achieving the purposes of the park. That, I think it's interesting that almost all of your arguments go back to some substantial generality, Marbury, you know, like the purpose of the White House. We're talking about, you know, Ms. Hoagland's specific interest. What is her particularized concrete use? I mean, she says that she's going to walk past the White House maybe once a month. She doesn't really say anything specific about the kind of use that constitutes an Article III injury, in fact. So maybe drill down on the specifics, because standing isn't just a generalized feeling. It absolutely isn't. But here, she has made that very specific statement. If we look at her declaration, she says she intends to continue to travel to the area, to walk through Lafayette Square, and to continue to be impressed by this iconic building and appreciate that the building embodies the ideals on which the nation was founded. Why is that a generalized pretense? Because then we look at what the Park Service says the park is designed to do, how you would use that park if you were to go and use it. Everyone understands if you go to Yellowstone, you use the park by going and looking at Old Faithful. You look at the bison. You look at the mountains. That's how you use Yellowstone. The National Park Service says, here's why we established this park. We established it so that you would preserve the cultural resources of the White House. And they say on their website, it is a site for national discourse about what it means to be American. As one of the most iconic sites in the country, it seeks to tell the stories of all the people who have lived, worked, and visited there. When she goes to this park and does those things, she is using that park exactly as the Park Service says it should be used. She's not saying that she's walking by and not taking a look. She's not saying she's on Pennsylvania Avenue just headed somewhere else and doesn't even know that the White House is on her left. She is saying, I go there and I do exactly what the Park Service says I should be using. Any passerby of any federal building would have standing to challenge physical changes to that building. I think that's what I just did not say. I just said, if she were just walking by on Pennsylvania Avenue and didn't look at it and didn't give it a second glance, then of course she wouldn't have standing. All you have to say is, I'm a passerby who is looking at a federal building. No, in this particular instance, it's a federal national park, and she goes and uses that park exactly as it should be used. Now, there's a difference between standing and your right of action and your claims, right? For standing, we just need to have an aesthetic injury. In fact, is it possible that someone is walking by a federal building and has the ability to say, this harms me greatly because of its aesthetic monstrosity-ness? Very possible. If somebody else walks by and says, that's great, maybe that person doesn't have standing. But that's not our test. Our test is whether there's an aesthetic injury to how you use or desire to use or observe something for aesthetic purposes. That's Wuhan. It says, that is undeniably a cognizable injury for the purposes of standing. The government's position seems to be that every aesthetic injury is really a psychological injury, and every psychological injury is not cognizable. Unfortunately, that's not what Lujan or Summers or Friends of the Earth say. What about germane-ness of trust? I mean, the trust is not a private- I mean, the trust is created by Congress for certain purposes. The trust has no authority over the White House or its grounds. So, Congress has limited the trust's authority, and yet the trust is coming to use the Article 3 courts to control the White House. So, I'm not sure how that can be germane to the trust's purposes. Sure, I'd say two things. The first is that the Supreme Court has said germane-ness is not a particularly demanding standard. The reason- So, that's our baseline. And where we start from on that is the reason it exists in our standing jurisprudence at all is because the courts have said we are trying to avoid people with no expertise whatsoever coming in and bringing courts these claims. That's true for private entities, which we generally allow to, you know, define their own purposes. If you're Sierra Club, we're not going to question that you're interested in the environment or something like that. But the trust is not that type of entity. The trust's purposes and powers are set by statute. And so, it seems very peculiar for the Article 3 courts to do an end run around what the trust could do directly by allowing the trust to bring a lawsuit that is not germane to its statutory purposes. And there was nothing in your brief responding to any of these. I believe our file does, but let's walk through it. So, if we look at their Enabling Act, that's 54 U.S.C. 312-102, it says that they're established to further the policy enunciated in Chapter 3201 of this title and to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest. And then they are established, right? There's then the Purposes Clause. And the government wants to go right to the Purposes Clause. One thing I want to make clear at the outset is that that Chapter 3201 is not the National Historic Preservation Act of 1966. That's where the exemption for the White House is, in Section 107 of the original Act. That reference is to the Historic Sites Act of 1935. It's an entirely different Act. The reason that the National Historic Preservation Act and its 107 exception for the White House isn't here is because there's no claim to be brought. It is exempt. That's why there's no NHPA claim in this case. You have to look at the policy that they are being asked to further, and that's the Historic Sites Act. But you don't doubt that the Trust doesn't have any authority over White House grounds? No one has any authority over the White House grounds under the National Historic Preservation Act. That's a separate statute. Right. You can't acquire property on the White House grounds. You can't manage or further or promote any of those properties. That is not authority that's been given to the Trust. I don't think that we're claiming it has. What we are saying is that if you look at the... I think it's an injunction from a district court to control how White House property is used, even though there's no direct authority. Again, we're talking about germaneness. But if you look at the Purposes Clause, it says they can do four things. Their purpose is to receive donations of sites and buildings, preserve and administer the sites, accept, hold, and administer gifts of money, and execute other functions vested in the National Trust by this chapter. That's a catch-all. And this chapter, as we've just seen in Paragraph A, says that there's to further the policy establishment of the Historic Sites Act and to facilitate public participation and preservation of sites. Those are verbs. To further a policy, to facilitate public participation, and that's what they're doing here. They are taking those established purposes as functions vested in them by Congress, and they're saying that's what we're going to do here. So a generalized purpose is a function vested by law? I don't think it's a generalized purpose. It's a very specific one. Their purpose is not go forth and do all things that you may want to do. They're being instructed to facilitate public participation in preservation of sites, buildings, and objects of national significance or interest. That's about as specific as you can get to furthering the policy. What that policy says, just so everyone is clear... So the trust could do that with any federal building anywhere? Is it one of an object of national significance? I think the White House is. I mean, I may be wrong, but I think the White House is... I think the White House is something of national significance, but Congress seems to have carved that out from the type of building. Again, they haven't. We're talking about two different acts, right? If I had said the Medicare Act and the National Historic Preservation Act, maybe we would have a bit more common ground here into understanding why those are different. But the Historic Sites Act of 1935 is 31 years before the National Historic Preservation Act of 1966, right? The 66 Act is what says the White House is excluded from 106 review, right? That's going through the Chapter 106 process. You have certain types of consultations. You bring in the D.C. Historic Preservation Officer. You have an MOU that resolves how you're going to deal with historic matters. That is not an issue here. We haven't brought a claim here. If it had been, we would have. But we didn't because it's not. We are looking solely at the trust's established purposes, and those purposes as established by Congress. So the trust can't do the specific thing, but they can go to court to enforce the general thing. There are two different things. It's like saying you have 18 different causes of action. You're saying you can't do one of them, so therefore you don't have the other 17. That's never how the two courses work. So, I mean, I think the concern is that the purposes are to receive donations of sites and then preserve and administer those sites. And the concern is that the trust has no authority to receive and administer property in Presence Park. Correct. And so you need to show that it is germane to the trust's purposes to preserve objects of national significance that it has no authority to receive and administer. And it sounds like you'd have us look at A, which might be enough or might not. Is there anything else in the statute that would point us to address this concern? Yes. So look at B, 4. B, 4? That just refers to the rest of the chapter. So what else in the chapter refers you, helps on this? I don't mean to be pedantic, but the chapter includes 312-102-A. Right. So you're agreeing with me that you're relying on A? I am. I'm relying on A by virtue of B, 4. The government's position is that A is merely a hortatory clause that says nice things about historic preservation. I think it would be rather surprising that Congress would say we would like to have an entity that furthers the purposes of the Historic Sites Act and also facilitates public participation in the preservation of sites, but the only thing you can do is acquire sites and expend money on them. It would seem that when Congress says we have broader purposes for this organization, those are other functions that is vested in the trust, and that's squarely covered by B, 4. We don't read sequentially and forget what we've just read. It's for the entire chapter, which means we go both up and down the line. If there are no further questions on standing, I would turn to the arguments on the merits, that's 105D and the Organic Act. 105D doesn't authorize the President to do anything, as we've just had previously in the discussion with the government. The way the Red Book says that you authorize and appropriate is pretty clear. You authorize Congress to do something, or Congress authorizes itself to do something, and it says your appropriators can then appropriate for the things that you have authorized, and it's even clearer in 105D. It's a serious thing. Congress doesn't need to authorize itself to do it. It can just pass an appropriation. It could. So what is the purpose of 105D? 105D sets the bounds for what Congress says it can do, because Congress- Can change that for the next appropriation. I don't understand quite what the purpose of it is. The purpose entirely? The appropriation authorization, quite frankly. Partly, it's how Congress has decided to set its own rules and how it will establish a system for how it orderly creates funding for various projects. I think for this in particular, it's important because Congress, as we know, has the plenary authority over federal property, and there's a huge distinction, which was articulated in the colloquy before, about 105A, B, and C, which say the President may do something. It authorizes the President, right? And it's for staff, and I think it's correct. Congress says we're setting limits on how many people you can have on your staff, but it doesn't matter to us who they are. You can go and decide whether you want lots of lawyers, whether you want lots of policy people. They've just got to fall in various classifications of GS levels, and you're good to go. D is different. D doesn't say you're authorized to go and do whatever you wish. D says there is authorized funds for these specific activities, and then after listing them out, it says the President may utilize those funds only for the purposes appropriated. So we have a set of requirements that say, here's what you can spend it on, and then it says, we're going to give you some money, and that's all you can spend it on. And as we know... MARY JO GIOVACCHINI Sorry. Is it saying the President can do anything, or it says we can appropriate for these things? And once we do appropriate, then the President can deal with the money? DAVID WRIGHT Sure. It's once we do appropriate, the President can then do what he wishes with the funds. But it has to be consistent with what 105D says he can do. He can't go beyond the bounds of 105D. He can't, as the government seems to say, turn it into a roving construction authority just because Congress has provided a small amount of money for things like care, maintenance, refurnishing, heating, lighting, alterations, improvements. CHAIRMAN POWELL So that sounds like you're saying you don't read 105D as just and only an appropriation authorization. It's an appropriation authorization. And then in the bottom paragraph here, is an authorization to act limited by the scope of appropriations? Is that a fair summary? DAVID WRIGHT That's all that he can do. All he can do is limited by the amount of money, do the limited things that Congress has told him he could do if they gave him money to do those things. It is not a free-floating grant of authority. And we know this because that's what history tells us as we cite in our brief. This isn't a new provision. This provision goes back for at least 100 years. And we know that Congress has used the same rough language to give the President a maintenance allowance. And we also know that throughout that 100-year period, there have been large public projects at the White House. When the roof of the White House had problems, Calvin Coolidge was still getting this maintenance allowance. Congress then appropriated a certain amount of funds for a major capital project to repair the  When Truman said, I need a gut rehab, the building's falling apart, my piano fell through the floor, they said, right. They didn't put a lot of money into his 105D account. They said, we will appropriate you a separate capital appropriation for doing that renovation. So the history is that Congress views this as limited, a maintenance-type project, so that scale and scope. And when it wants something bigger, it steps in and exercises its property clause authority. It says, you want to do something more than just routine maintenance projects or small little improvements around the house? Then you come to us and we will tell you the scope and the amount of money you can have for that. And I'll say this goes- Historical examples of presidents using the gift authority to build structures on the White House grounds, like the swimming pool and the tennis pavilion. Are we going to gift authority away from 105D? Well, but the gift authority, I mean, those are arguably a kind of improvement. They are potentially improvements. And I think, you know, if we're talking about what's an improvement, improvement may be something very small. But the other question is, you still have 8106, which steps in. So you can have an improvement that says, I'd like to improve and build a patio. That's not a building or a structure. You would like to say, I'm going to alter a bathroom. That's not a building or a structure. There are interlocking elements here, all of which the government needs to be able to demonstrate that they've done in order to do what they are doing. Well, but actually, the trust has brought an ultra-virus claim. So you have to show that any violation of these statutes is so extreme that you can get a Hail Mary pass against the government. And so the word improvement in 105D, I mean, 105D, like 105D-1 is about real property, right? And improvement has a meaning in real property that includes buildings and structures and specifically means not minor repairs. So that is a very established common law meaning from property law. And if that is a possible meaning of 105D-1, I mean, even if you don't agree with that meaning, how do you prevail on an ultra-virus claim? Sure. So I'd say two things. One, on the Hail Mary pass, the Hail Mary pass is difficult to complete only if the defense has sent back people into the end zone. And here it seems the government is having a bit of difficulty even just calling its place. It doesn't know whether EXR is in charge or the Park Service. No, it's back to the Park Service. It's not EXR. Is it that the ballroom is an integral element of the bunker or absolutely nothing to do with it? You're not answering my statutory question. But the issue that we have here is that all we need to demonstrate for an ultra-virus claim is that there's a clear command. And the clear command here in our position is 8106. It's a thou shalt not. Thou shalt not build in a federal park in DC. But that just begs the question of whether 105D does provide the authority. Yes, 8106 says you need authority. But then my question is, why doesn't D1 provide authority or at least arguably reasonably provide authority, which would be enough to defeat an ultra-virus claim? Sure. A couple answers to that. First, as we know, Congress doesn't hide elephants in mouse holes, right? Here we have a statute that says you can do heating, air conditioning, lighting, other things. It doesn't say the president can do it. It says Congress can appropriate money for that.  And if Congress appropriates money for that, then the president can spend his discretion for that. Correct. He can spend... I thought your answer would have been in 2024, 2025, and 2026, the appropriations for Congress did not include the word improvement. That's entirely true. They've done only for maintenance and preventive maintenance and health and safety purposes. But even... Improvement's not in any of the appropriations. Whatever discretion the president may have under here, it's only for sums appropriated for such expenses. We do not disagree in the slightest. I think Justice Rao's question may have been, even if they had appropriated slightly more money, or if they had appropriated to the full extent, could he have used it? And our answer there is still that the answer is no, because improvement, as it is interpreted in isolation... Maybe I'm wrong. And Justice Rao will correct me. I don't think she's asking an abstract question. To the extent that she's not asking... Whether it was clear, whether you could bring out a various action that the president, in this case, couldn't do this thing when, in fact, the statute mentions the word improvement.  The appropriations have not. I will remain silent unless there's another question as to this. No, no. I'm just... So in terms of like whether Congress has appropriated, I mean, Congress, you know, they're obviously, you know, I take a trust to be saying it has to be like a line item appropriation. But Congress has also provided for this gift authority in the NPS Organic Act. And so, and that gift authority has been used in the past for, you know, fixing things up in the White House. And so, you know, the fact that there's not a line item appropriation that specifically says you can improve or make a ballroom or something like that, I'm not sure that that answers the question either. Where there is this statutory gift authority that can be used by EXR and has in the past been used by EXR? So they, as we've just had this discussion, EXR only has that authority if they receive it from the Park Service. The Park Service, therefore, needs to be able to do it on its own. The Park Service's statute doesn't say anything about constructing buildings in the District of Columbia, which is what they need to be able to do under 8106. As the government conceded, all there is, at best, is an implied authority to construct. That implied authority certainly isn't express authority. Those two are very different and contravening terms to one another. Furthermore... How does the ballroom not promote the use of President's Park, where the president has said that it's important not only for national security, but for hosting, you know, state dinners and, you know, a whole range of important functions that take place at the White House? We know it doesn't because the Park Service itself, in its own environmental assessment, said that there would be permanent adverse effects to the park by building the ballroom. And when you have an adverse effect, what the government, what the statute, the Park Service statute says is impairing a fundamental resource of the park. And recall, the Park Service says the White House and its wings are the fundamental resources. They make that park the park that it is. If you're going to do that, you also need to go to Congress and get their direct and specific authorization. So here, you just don't have 8106, which says you have to go to Congress to get express authorization to build on a park in the District of Columbia. You also have the Organic Act, which says that you need to have the direct and specific approval of Congress if you're going to impair the park, which the Park Service has conceded that this project will do. There's no way around that to just say, I really want to do this, and I've got the funds here I'd like to build. And even if there were, that wouldn't get you over into 105D. There's nothing that says you can move your Park Service funds, bring them over into 105D and deposit them in the 105D account, and then say Congress has approved them as though they were 105D funds. The President only gets to- I think that's their argument. I think their argument is, NPS could come and you can, you have your arguments against them, but their argument is, NPS could come and do this, or NPS can contract with EXR to do it, through the Economy Act, and it's chosen the latter route. Sure, and then we would have an- If you're depositing these funds in a 105D account, this is, these are funds that belong to NPS, and NPS can do this, and it can, if it can do it, it can ask EXR to do it. I think that's the argument you need to answer. I mean, I think, I hope that's what I just, which is that- It has nothing to do with depositing things in a 105D account. That's not what they're saying. That, that was their position below, initially. This is part of the difficulty here. I'm not concerned with what their arguments are here, and the ones the district court addressed. Correct. So, our argument on the Organic Act is straightforward. The Organic Act says, does not provide the express authority to construct on a federal park in the District of Columbia, which this is. So, there's no express authority in the Organic Act. They're claiming that there is merely implied authority, and that just doesn't get them far enough. If that's not enough, then you have the second provision of- That's not what the government said. I mean, the government said that they view promotion of parkland as an explicit authority. I mean, you can say that it's not explicit, but I mean, I don't think it's fair to say that the government said it was an implicit authority. I mean, I think in their brief, they say they think it's implicit, but I think that's around page 47 or 48. I'm just saying what they said. If they're saying something differently here, then we're of a piece. The issue here is that they don't have the authority under either 8106 or under the second paragraph of their Organic Act, which says that if you were going to impair a fundamental resource, you need to go to Congress. They just don't want to go to Congress. But that's not what the statutes say, and that's what the constitutional framework requires, which is that you do go to Congress, because Congress controls federal property. And when Congress says, I would like something to happen or not, that's what we deal with. And previously- My understanding is that they have a lot of arguments based on practice, and one of their better examples is the tennis pavilion that was constructed. My understanding is that is a structure. Do you have an argument that that- Was that permitted under your reading of the NPS Organic Act and 8106? So the obvious caveat that that's not this case. I think there are a couple of things to say. You could have some examples in the past that were, you know, not authorized. That's a position you can take. I'm just curious if you think. Correct. So there's some that, you know, they talk about the tennis pavilion. They talk about the park service stables near the mall. Our position, first of all, as you see in our brief, is that many of these things actually were authorized by Congress in our view. Mission 66, the funding provisions, funded a number of these items. So the notion that Congress didn't know they were happening, and they just happened to appear is not true. Second, we would say that to the extent that 8106 is a clear statutory command, the fact that people didn't contest these things in the past is not the issue here. Here we are contesting it. The issue is joined, and therefore the clear command, as the Supreme Court has said in lexicon, can't yield to the fact that prior practice has done something different. And we would say the same thing about Ford's Pool and the tennis pavilion, the changing pipe on those- on the White House grounds. Did those violate 8106? Probably. Did anyone challenge them? They did not. Why didn't they challenge them? Maybe because the juice wasn't worth the squeeze. They're small projects. You can't see them. They're for the President's own personal use for him and his guests. But if they had been challenged, 8106 would certainly apply. The same rationale, someone says, I always drive 57 miles an hour in a 55 zone, and I never get caught. So when I get pulled over, you tell the police officer, you can't pull me over for speeding because I always go 57. The police officer says 55 is 55. That doesn't change because you violated in the past. It's what's happening at the moment, and that's what we have here. We have challenged this as violative of 8106, and that's something the court needs to respect and take into account. And that's exactly what the district court did. Further questions? Yes. Can you speak to the equities here? I mean, the President has talked about the national security interests, you know, both below the ballroom and the ballroom structure itself, the necessity of this, you know, both for social purposes and national security purposes. And on the other side, the trust has some aesthetic concerns of someone who walks past once a month. I mean, based on those equities, I mean, how do the equities weigh in favor of the trust, given what's at stake here? Sure. Just on that point, before I talk about the difference, when you say that it's always been a national security issue, their reply brief says that they have never suggested that the below ground facilities were independent of the ballroom. Their supplemental reply brief said the below surface work is driven by national security concerns independent of the above grade construction. So part of our issue here is that the national security issue is not one that they have consistently represented, even as to the district court. Some of these issues were classified, and over time, I think because of this litigation, the President and the Department of Justice have provided more details about the national security purposes of both the ballroom and the underground facilities. Does the trust question those national security concerns? I mean, I don't know on what basis it would. So recall, the trust brought this lawsuit before anyone knew that there was an underground bunker being constructed. Okay, but now we know. And now we know more about it, and we know more about what's, you know, anticipated for the roof of the ballroom and how the ballroom structure itself is protective of the underground facilities. So I don't take the trust to be questioning the government's representations about those things. I mean, there's a lot of waving at, okay, that's not what they said initially. But you can understand why the government might want to keep some of those issues, you know, matters classified, because they don't want to advertise the types of facilities they're building for national security purposes. And they've had to do so in, you know, in order to, you know, in the course of this litigation. But does the trust question that there are these serious national security concerns? No, and we have never opposed the underground construction of the bunker, which is where the government, until recently, has said the national security concerns lay. But does the trust question that the ballroom is now is part of that?  And that, like, the roof of the ballroom is going to be used, you know, for a drone port or, you know, whatever these, you know, other, you know, more information that we've received about how the ballroom is going to function? Yes, and I would say two things on that. One, the district court reviewed not one, not two, not three, but four ex parte in camera filings about national security. We obviously haven't seen them. This court has seen them. The district court has seen them. The government's seen them. We're the only party here who has no idea what they're talking about. But what we do know is that the district court reviewed all of those. The district court said and made factual findings that are reviewed on clear error, that it found no basis for a claim that national security required the ballroom. And then it entered a very narrow injunction in our favor, which says you can continue doing all your below ground national security. You can preserve the White House. You can protect the safety of the president. The only thing you can't do is build above ground a ballroom. And they had an opportunity when this court remanded back on national security grounds. This court said, tell us just about the national security question. At that moment, it would have been entirely appropriate for the government to have submitted the affidavit from the secretary of the army, because that's what the judge in the district court was looking at, and said, here are the issues. They didn't. They submitted nothing from the secretary. They only submitted that two days later with their stay on motion for an appeal. Okay, so let's talk about the equities. If we assume for a minute that what the government is saying, we credit the government, we give them a presumption of regularity in many manners and national security more than most. And if those national security interests are what the government says it is, how can equities weigh in favor of national trust?  First, the government has set it up as essentially the aesthetic injury versus the national security injury. And that's the improper way to do it. The aesthetic injury is what gets you through the courthouse door. That's a standing-based argument. Once we have standing and you're in, then we're talking about the balance of equities. And quite frankly, here the issue more goes to what the resolution would be, what the redressability is. And the redressability here on the standing side was the project should be stopped, and the construction should be stopped until Congress gets to say, pursuant to its property clause tower, what can and can't go on at the White House in terms of construction. That's the balance of equities. The balance of equities is Congress's right to be able to be involved and say, here is exactly what you can do. You can leave a hole. Congress can allow a hole to be left. It's property. Build a ballroom. Congress can allow a ballroom to be built. It's property. But the government's position is that these affidavits about national security supersede Congress's property clause power. But we know from Youngstown that that's not how it works. In Youngstown, the Supreme Court faced a nearly identical circumstance. The government said there's an exigency, a national emergency. We're in the middle of wartime. We must have this. The court said no. It said when Congress has the legislative tower, it cannot be usurped by the executive even though the executive says national security imperative. We have the same thing here. The property clause is plenary. It goes only to Congress. The district court didn't rely on the property clause. The district court didn't rely on the property clause because presumably it felt it didn't need to. Well, but the whole question about the property clause, I mean, again, you know, I think it's very interesting that Justice keeps going back to it, you know, the most, you know, broad argument because the whole question about the property clause is, did Congress, in fact, give the authority? And then we talk about the Organic Act and 105D, right? The district court made no conclusion about the constitutional claim that was brought. But the government's position here is that even if they're unlikely to succeed in the merits, that they still should have an injunction issued because of national security. And that is a very concerning point because what the government is saying is that even it is correct that neither of these statutes apply and therefore the only thing left is a constitutional authority, which we don't have. This court should still enter an injunction because national security trumps all.  Interest stay. Or interest stay or reverse the injunction, vacate the injunction. But that's a question of available remedies, right? I mean, the district court could enter a declaratory judgment. You know, the question is, do the equities weigh in favor of the trust getting the equitable remedy of an injunction? The answer is yes. And again, the notion... Because of the property clause. Because of the property clause, because of the injury that, you know, they want to say it's because of the aesthetic injury and they want to balance it and say one person looking at the White House doesn't mean... But that is the injury that you've put forth. That's the injury, but that's not balance of equities. Injury gets you in the door. Balance of equities is, is it appropriate to allow the injunction to stand or to issue the injunction in the first place from the district court? The equities are the competing... The first two prongs are the competing injuries of the two parties. Sure. And here... I mean, you can't just keep walking away from her question with, we don't need to talk about the injury anymore. That, in fact, is irreparable injury to you, balance against harm to the government and public interest. That's what the balancing of equities is. Well, I mean, I think we would say that the balancing of equities is the third prong in that test, right? You know, likely to succeed in the matter. What do you think the equities are that are balanced? The equities that are balanced are the fact that you have a national park that has been turned into, or you have a national park whose fundamental resources, one of them has been demolished and is being turned into a 90,000 square foot ballroom, which is a harm to, as we just discussed, to Professor Hoagland, to the National Trust, and to the national park that they are going to view. That's significant. Congress has a right as to what goes on in that park, and that's the remedy that they've sought, that Congress should be able to come in and do it. And we've said that we are allowed to say to this court, Congress has the right to determine what happens with federal property. We are looking at that federal property. We are harmed by it. And the notion that national security supersedes that is simply not what the court has ever said before. You know, we have a new world. Okay, just sum up your last point here. I say that, you know, when we talk about, you know, drone ports and all these other activities, this is a similar argument that the government made earlier this year to the Supreme Court in the Burkhart citizenship case. They said things have changed in the new world. And Chief Justice Roberts said it may be a new world, but it's the same constitution. And that's our position here as well. All right. Thank you very much. Mr. Roth, we will give you three minutes for rebuttal. Thank you, Your Honors. So just a few things on the different points. On standing, we are not saying every aesthetic harm is merely psychological harm. What we are saying is that subjective visual disagreement with something the government builds, where the objection is to the statement or message that it sends, that is not cognizable injury, in fact. And it's not just us saying that. I think that is what EDF says. I think that is what Alliance says. And I think that has to be true, or else we would be welcoming and inviting lawsuits over anything the government does that has a physical manifestation that someone finds offensive or upsetting. That is not the law. On germanness, I think counsel was mischaracterizing the argument. We are relying on the subsection B, which specifically enumerates the purposes. Subsection A says, we care. We, Congress, we care about historic preservation. We're going to create this trust. And then subsection B says, here's how it's going to advance that goal by doing these particular things. And they conceded none of those have the required nexus to this lawsuit. On the merits, I did not really hear a serious answer to the NPS Organic Act part of the  I heard counsel cite the NPS environmental assessment and took one line out. Yes, as part of that lengthy analysis, NPS considered all the positives and all the negatives of the project and reached the conclusion that, on the whole, it was consistent with advancing the purposes of the park unit. You can't just pull out one line and say, see, they acknowledge there was a harm and call that arbitrary and capricious or whatever it is they want to say about it. That analysis, by the way, is in JA 97-144 of the appendix. Then I heard him say, well, even if NPS can build, 8106 says that in D.C. they need something more. And I think 100 years of practice shows otherwise. And yes, if the text were absolutely crystal clear, maybe that would not be good enough. But it's not. The text is not that clear. It says you need authority. And it's perfectly reasonable to read that as general authority to build on parkland. And that's how the Park Service has understood it and applied it for a very long time. This is for the APA claim against the National Park Service? Well, either whether it's characterized... It requires a clarity. But this is... I think so. I think... The better reading of the statute for contrary to law. I think it is. I think our reading of the statute is the better reading of the statute. Which I understand you used the word clear. Yeah. I also heard counsel say that some of the projects in D.C. National Parks have been funded by Congress. That is true. But they were funded by lump sums. So if that is good enough for 8106, then I don't know why this isn't good enough for 8106. There's a statute that says you can take donations and they're authorized to be appropriated and dispersed consistent with the purposes of the trust fund. That should be good enough if all the other projects for 100 years were good enough.  And on equities, I'm not sure I have much to say. It is conceded it's an interest in aesthetics and the park versus what senior military officials have said is critical to protect the president and the continuity of government. And I don't... As in winter, I don't think that is a close call on the equities. Unless the court has further questions, we'd ask to reverse the injunction. All right. Thank you to all counsel. The case is submitted.
judges: Millett; Rao; Garcia